UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| DAVID P. TAYLOR, : | |
| Plaintiff, : | |
| : | PRISONER |
| v. : | Case No. 3:06cv1329 (SRU) |
| : | |
| DR. MATT CONWAY, et al.,[1] : | |
| Defendants. : | |

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff David P. Taylor, an inmate currently confined at MacDougall-Walker Correctional Institution, brings this civil rights action *pro se*. He alleges that, while he was confined at Cheshire Correctional Institution, the defendants subjected him to "a dangerous and hostile work environment" in violation of the Eighth Amendment and subjected him to retaliation in the form of verbal harassment and dismissal from his job when he claimed that a supervisor was smoking in the workplace. Am. Compl. at 2. He seeks damages as well as declaratory and injunctive relief. Defendants have filed a motion for summary judgment. For the reasons that follow, defendants' motion is granted.

---

[1] The named defendants are Dr. Matt Conway, Richard Alhage, Harry Soucy, Steve Petracca, Andrew Pace, Patricia Freeman, Jeffrey Adgers, Daniel Martin, A. Hannah and Jason Hogan. The defendants are named in their individual and official capacities. Defendants state that the court previously dismissed all claims for damages against them in their official capacities. A review of the record reveals, however, that both previous motions to dismiss were denied in light of Taylor's amended complaint.

I.   Standard of Review

The burden is on the party moving for summary judgment to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. *See* Rule 56(c), Fed. R. Civ. P.; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The moving party may satisfy that burden by demonstrating the absence of evidence supporting the nonmoving party's case. *See PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam). The court construes the facts in the light most favorable to the nonmoving party. *See Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir.), *cert. denied*, 127 S. Ct. 382 (2006).

Where one party is proceeding *pro se*, the court reads the *pro se* party's papers liberally and interprets them to raise the strongest arguments suggested therein. *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). Despite such liberal interpretation, however, a "bald assertion," unsupported by evidence, cannot overcome a properly supported motion for summary judgment. *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991).

II.   Facts [2]

   A.   Taylor's Work History

The Department of Correction, through Correctional Enterprises of Connecticut ("CEC"), affords inmates at Cheshire, Osborn, MacDougall-Walker and York Correctional Institutions the opportunity to participate in a job program. Inmates apply for a work assignment and are paid a nominal amount for their participation. Inmates work at the discretion of the Department of

---

[2] The facts are taken from defendant's Local Rule 56(a)1 Statement of Undisputed Facts [doc. #70-2], plaintiff's Local Rule 56(a)2 Statement [doc. #82-3] and the exhibits submitted by both parties.

Correction and CEC. They have no entitlement or legitimate expectation to a job assignment. Inmates working in a CEC assignment work five days per week, approximately six hours per day. Inmates may be removed from employment for failure to perform or for any chargeable infraction, regardless whether they are found guilty of the infraction. Department of Correction Administrative Directives 10.1 & 10.20.

Taylor is a trained engineer who has been in the custody of the Connecticut Department of Correction since March 1999. On June 28, 2003, Taylor was assigned to work in the Marker Shop at Cheshire Correctional Institution, which is operated by CEC. The Marker Shop is located in a stand-alone industrial building within the Cheshire Correctional Institution compound. The building, approximately 10,000 sq. ft. with 20' ceilings, has a ceiling fan for ventilation, many windows, three exterior doors and one large garage door.

Taylor was added to the payroll of the Marker Shop on July 21, 2003. That same day, he signed a form acknowledging his understanding of the Marker Shop rules as well as training and safety requirements. One safety requirement was wearing safety glasses when using any machinery or tools.

On September 9, 2004, Taylor was removed from his job at the Marker Shop and transferred to another correctional facility. He returned to Cheshire Correctional Institution on November 29, 2004, and reapplied for his job with CEC. He returned to the Marker Shop on December 28, 2004. On February 8, 2005, Taylor signed a form acknowledging his understanding of the training and safety requirements of the Marker Shop and Plastic Shop. Again, one requirement was wearing safety glasses when using any machinery or tools.

On February 9, 2005, Soucy issued Taylor a poor work report for not wearing safety

glasses. Because it was Taylor's first offense, he was sent back to his housing unit without pay for that day. Taylor was cautioned that another offense would result in dismissal.

On September 2, 2005, prison officials removed Taylor from his position in the Marker Shop because of a change in his classification. On October 17, 2005, Taylor's classification was returned to outside clearance. Taylor reapplied and was reinstated to his position in the Marker Shop.

On December 15, 2005, Soucy removed Taylor from participation in the job program. Soucy reported that Taylor admitted damaging a piece of manufacturing equipment, trying to hide the damage and not notifying any CEC staff of the damage until the damage was discovered by Soucy. Taylor concedes that there were scratches and a small dent on the machine but denies that the machine was damaged. Taylor received a second poor work performance and a disciplinary report for destruction of property. After a hearing, Taylor was found not guilty of the disciplinary charge. Taylor then reapplied for participation in inmate work program and a return to his position in the Marker Shop. The request was denied. Taylor later was transferred to MacDougall-Walker Correctional Institution.

B.   Exposure to Environmental Tobacco Smoke

In 1996, the Department of Correction adopted a smoke- and drug-free policy. *See* Defs.' Local Rule 56(a)1 Statement, Ex. T, Department of Correction Administrative Directive 2.21. Pursuant to the policy, any correctional employee wishing to smoke a cigarette on his break, must do so in a designated smoking area. The unofficial designated smoking area for the Marker Shop is outside the building. Correctional staff in the Marker Shop must supervise inmates. Because of staffing constraints, they cannot easily be relieved from their posts to take a smoking break.

Defendants state that staff assigned to the Marker Shop have been permitted to smoke just outside the shop with the large garage door open so they can view the inmate workers.

Soucy, a supervisor in the Marker Shop, is a smoker. In 2005, Taylor complained to Alhage, the CEC manager, about Soucy's supervision. Taylor stated that Soucy was overly critical of Taylor and his work skills. Taylor requested a transfer to another CEC work area. Alhage denied the request because Taylor's skills were best suited to the Marker Shop and there was no guarantee that Soucy would not supervise Taylor in the future at a different job. Alhage states that Taylor did not complain about environmental tobacco smoke ("ETS") at that time. Taylor contends that he complained to several individuals about Soucy smoking in the Marker Shop on February 9, 2005. Taylor was exposed to ETS in the Marker Shop on approximately 255 days.[3]

Following his dismissal from the Marker Shop, Taylor wrote letters to the Commissioner of the Connecticut Department of Motor Vehicles; Director of CEC; and the Connecticut Department of Public Safety, Division of Fire Emergency and Building Services. In all three letters, Taylor complained of unsafe working conditions in the Marker Shop. Investigations

---

[3] Defendants state that Taylor worked in the Marker Shop for 255 days. Taylor states that he worked there 544 days. Assuming that Taylor worked five days per week for the periods from July 21, 2003 through September 9, 2004, December 28, 2004 through September 2, 2005, and October 17, 2005 through December 15, 2005, he would have worked, at most, 422 days. If Taylor's contention, that he was re-employed in the Marker Shop immediately after his return to Cheshire Correctional Institution on November 29, 2004, is correct, he worked in the Marker Shop, at most, 443 days. The relevant time period, however, is not how many days Taylor worked in the Marker Shop, but how many days he was exposed to ETS.
   Taylor states in his affidavit that Soucy was not assigned to the Marker Shop when Taylor began working there. Pl.'s Aff., Doc. #82-2, ¶ 38. He states that he received good work reports before Soucy was his supervisor and provides an August 21, 2004 work report signed by Alan Brown. Nothing in the record indicates that Soucy was Taylor's supervisor before that date. Taylor claims that only Soucy smoked in the Marker Shop. Thus, Taylor's ETS exposure began in late August 2004, and lasted approximately for the 255 days calculated by defendants.

taken in response to those letters revealed no safety or code violations.

On July 17, 2006, Taylor underwent a dual chest x-ray. The results were normal. On September 27, 2006, a second dual chest x-ray revealed a mild hyperaeration of both lung fields. The doctor noted a possibility of right upper lobe pneumonia and recommended clinical correlation and follow-up. On November 3, 2006, Taylor requested a continine test for his complaints of PPD, hyperaeration, pneumonia and ETS. He told medical staff that he had worked in the oil industry and always had perfect health.

A November 6, 2006 chest x-ray revealed that both lung fields were mildly emphysematous, but showed no evidence of active infiltrate or vascular congestion. The impression was mild chronic obstructive pulmonary disease ("COPD") and completely resolved right upper lobe pneumonia infiltrate. The COPD diagnosis was confirmed on March 15, 2007. Department of Correction physician Dr. Blanchette states that COPD develops slowly with symptoms appearing many years after exposure to ETS or other severe environmental contaminants. Thus, he opines that Taylor's COPD could not have been caused by any ETS exposure in the Marker Shop.

III.  Discussion

Taylor asserts two claims in his amended complaint. First, he experienced a dangerous work environment because he was exposed to ETS as a result of Soucy smoking in the Marker Shop. Second, Soucy retaliated against him for complaining about the ETS exposure and other defendants failed to intercede to correct the retaliatory acts.[4]

---

[4] In opposition to the motion for summary judgment, Taylor argues that the hostile and dangerous work environment also was the result of other conditions in the Marker Shop that he raised in various letters of complaint sent after his dismissal. Taylor restricts his Eighth Amendment claim in the amended complaint to ETS exposure. He cannot amend his complaint

A.  Eighth Amendment Conditions of Confinement Claim

"It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney*, 509 U.S. 25, 31 (1993); *see also Rhodes v. Chapman*, 452 U.S. 337, 351 (1981). To state an Eighth Amendment claim, an inmate must allege facts demonstrating failure of prison officials to provide for inmates' "basic human needs – *e.g.*, food, clothing, shelter, medical care, and reasonable safety." *DeShaney v. Winnebago County Dept. of Social Servs.*, 489 U.S. 189, 200 (1989). A prisoner may assert a cause of action under the Eighth Amendment for deliberate indifference to a serious risk of future harm despite the absence of any symptoms stemming from the subject conditions. *See Helling*, 509 U.S. at 32-34 (rejecting argument that exposure to ETS cannot constitute violation of the Eighth Amendment where prisoner did not display medical problems resulting therefrom and discussing cases where plaintiffs successfully asserted Eighth Amendment claims despite absence of current symptoms).

An inmate may prevail on an Eighth Amendment claim if he can establish objective and subjective elements. *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). The objective element is satisfied where the inmate shows that the deprivation he alleges is sufficiently serious, *i.e.*, that his confinement under the alleged conditions violates contemporary standards of decency. In the context of an ETS claim, the Supreme Court has held that to satisfy the objective prong, plaintiff must demonstrate exposure

---

in a memorandum. *See Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (declining to address merits of claim that "does not appear anywhere in the amended complaint and did not enter the case until [the plaintiff] mentioned it for the first time in her opposition memoranda to the motion to dismiss"). Thus, no other Eighth Amendment conditions claims are included in this action.

to "unreasonably high levels" of ETS that would damage his future health and that the risk "is so grave that it violated contemporary standards of decency to expose anyone unwillingly to such a risk." *Helling*, 509 U.S. at 35, 36. The subjective element requires the inmate to show that correctional officials were aware of and disregarded a substantial risk of serious harm. *See Phelps* at 185-86. Defendants "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . . must also draw that inference." *Farmer*, 511 U.S. at 837.

All exposure to ETS is not unconstitutional; only exposure to an unreasonably high level of ETS is cognizable as a constitutional violation. *See Helling,* 509 U.S. at 36. Courts have held that inmates were exposed to unreasonable ETS levels when they were forced to share a cell with a heavy smoker. *See, e.g., Helling,* 509 U.S. at 28, 36 (finding exposure to unreasonably high level of ETS where inmate housed in same cell with inmate who smoked five packs of cigarettes per day); *Atkinson v. Taylor*, 316 F.3d 257 (3d Cir. 2003) (denying summary judgment and finding exposure to unreasonably high level of ETS where inmate housed for seven months with "constant smoker")*; Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002) (denying summary judgment where inmate previously required to share cell with smoker, always housed in unit where majority of inmates smoked and constantly subjected to level of smoke in cell as if he were smoking). Where the inmate was not housed with a smoker, however, the courts have rejected claims of an unreasonable level of ETS. *See, e.g., Richardson v. Spurlock*, 260 F.3d 495, 498 (5th Cir. 2001) (holding that sitting near some smokers sometimes is not an unreasonable exposure to ETS); *Zaire v. Artuz*, No. 99 Civ. 9817(LTS), 2003 WL 230868, at *1, *5 (S.D.N.Y. Feb. 3, 2003) (holding that inmate's exposure to ETS in common areas but not in

his cell over five month period did not constitute unconstitutional exposure to ETS); *LaCroix v. Williams*, No. 97-CV-0790, 2000 WL 1375737, at *2-3 (W.D.N.Y. Sept. 21, 2000) (holding that inmate suffered no serious injury when he merely alleged residence in a smoking dormitory and there was no objective medical evidence showing that his symptoms were caused by exposure to ETS).

Defendants contend that Taylor was not exposed to an unreasonably high level of ETS. Taylor provides no objective evidence of the level of ETS to which he was exposed. He was not assigned to a cell with a smoker and does not allege that he was subjected to ETS while in his cell. Taylor was exposed to one smoker, Soucy, while at his work assignment in a 10, 000 sq. ft. industrial building with a ventilation fan and exterior doors and windows. He does not allege that Soucy smoked constantly or regularly in the immediate vicinity of Taylor's work station. The incidents Taylor describes involve significantly less exposure to ETS than was present in cases denying summary judgment on ETS claims.

Taylor argues that society no longer tolerates any unwilling exposure to ETS and directs the court to *The Health Consequences of Involuntary Exposure to Tobacco Smoke, A Report of the Surgeon General*, Dep't of Health & Human Servs. (2006) (hereinafter "*The Surgeon General's Report*"), which concludes that there is no risk-free level of exposure to ETS.[5] *Id.* at 11. He argues that *The Surgeon General's Report* and the enactment of statutes prohibiting smoking in state buildings support his position.

---

[5] The report also concludes that evidence is insufficient to infer a causal relationship between ETS exposure and the risk of COPD. *The Surgeon General's Report* at 16. Thus, the report fails to support Taylor's assumption that his COPD was caused by the exposure to ETS in the Marker Shop.

Although the Connecticut legislature has prohibited smoking in state buildings, it created several exceptions. One exception is Connecticut correctional facilities. Conn. Gen. Stat. §19a-342 (b)(2). Thus, society continues to tolerate smoking in correctional facilities. In addition, to state a cognizable constitutional claim, the exposure must be unwilling. In January 2006, after Taylor was found not guilty of the disciplinary charge which led to his dismissal from the Marker Shop, he wrote to Alhage asking to return there. *See* Pl.'s Mem. Ex. H at 1. That letter, written nearly one year after Taylor alleges that he first complained about ETS exposure, demonstrates his willingness to continue that exposure. Taylor fails to demonstrate the existence of a genuine issue of material fact on the objective element of the deliberate indifference test, *i.e.,* that he was unwillingly exposed to an unreasonably high level of ETS. Because Taylor fails to meet his burden on the objective element of the test, the court need not consider the subjective element. Defendants' motion for summary judgment is granted with respect to the Eighth Amendment claim.

B. First Amendment Retaliation Claim

Prison officials may not retaliate against inmates for exercising their constitutional rights. To state a retaliation claim, Taylor must show that his actions were protected by the Constitution or federal law and that his protected conduct was a "substantial or motivating factor" in the alleged retaliatory conduct. *Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir. 2000). Because claims of retaliation are easily fabricated, the courts consider such claims with skepticism and require that they be supported by specific facts; conclusory statements are not sufficient. *See Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 2003).

To support a claim of retaliation, the allegedly retaliatory conduct must deter a similarly

situated inmate of ordinary resolve from exercising his constitutional rights. It is not necessary that the plaintiff himself be deterred. *See Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004). Any lesser conduct is *de minimis* and cannot support a retaliation claim. In addition, prisoners are required to tolerate more serious conduct in order to state a retaliation claim. Insulting language or disrespectful comments directed at an inmate are not sufficient to state a claim for retaliation. *See Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003).

Temporal proximity of an allegedly retaliatory disciplinary report to an inmate's grievance or complaint can be circumstantial evidence of retaliation. *See Gayle v. Gonyea*, 313 F.3d 677, 683 (2d Cir. 2002). In addition, the Second Circuit has held that evidence is sufficient to defeat summary judgment when there is both a short time between protected activity and the retaliatory conduct and direct involvement by the defendant. *See Morales v. Mackalm*, 278 F.3d 126, 131 (2d Cir. 2002) (short time between protected activity and retaliation coupled with defendants' involvement in the decision to transfer is sufficient to support inference of retaliatory motive). If, however, defendants are able to show that Taylor would have received the poor work report or been terminated from his job even in the absence of the protected conduct, they may evade liability. *See Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003). Defendants can meet that burden by showing that there is no dispute that Taylor committed the charged acts. *See Gayle*, 313 F.3d at 682.

Taylor states that he first complained about Soucy smoking in the Marker Shop on February 9, 2005. The poor work report for not wearing safety glasses was issued the same day. Pl.'s Aff., ¶¶ 35-36 & Defs.' Local Rule 56(a)1 Statement, Ex. M. Taylor states that he was performing precision engineering work without safety glasses. Although Taylor contends that

11

the poor work report was the result of the complaints about Soucy, he concedes that he was not wearing safety glasses. Taylor contends that he was not using any tools or machinery that required safety classes. On the previous day, however, Taylor signed a form acknowledging his understanding that he must wear safety glasses when operating *all* machinery and tools. *See* Defs.' Local Rule 56(a)1 Statement, Ex. L. Thus, Taylor was well aware of the requirement.

Taylor alleges that other inmates would have received a verbal warning rather than a written poor work evaluation. Am. Compl. at 3. He provides no evidence to support that allegation. Defendants have provided evidence that Taylor would have received the poor work report even absent his complaints about Soucy's smoking[6] and Taylor has not met his burden in opposition to the motion for summary judgment of presenting facts sufficient to raise a genuine issue of material fact.

Administrative Directive 10.1, Section 5(G), provides that any inmate may be removed from a work assignment if he commits a chargeable infraction, even if he later is found not guilty of the charge. *See* Defs.' Local Rule 5(a)1 Statement, Ex. C. Taylor was dismissed from the Marker Shop after receiving a disciplinary report for destruction of state property. He was accused of damaging the surface grinder and not reporting the damage. *See* Defs.' Local Rule 56(a)1 Statement Ex. R. The disciplinary charge was dismissed because: supervisors gave conflicting testimony regarding whether the damage rendered the surface grinder inoperable, the damage was caused accidentally, and Taylor had been dismissed from his job in the Marker

---

[6] Taylor also contends that the poor work evaluation was for violating a temporary requirement that anyone in a designated area must wear safety glasses. The work evaluation does not reference any such policy and Taylor has provided no objective evidence that such a policy existed. Taylor's unsupported statements are insufficient to support a claim of retaliation at the summary judgment stage.

12

Shop. *See* Defs.' Local Rule 56(a)1 Statement Ex. S. Taylor states that he was unaware that he was supposed to report minor accidental damage. *See* Pl.'s Aff., ¶ 56. Thus, he concedes that he caused the damage and did not notify any supervisor until the damage was discovered. Defendants have provided evidence showing that Taylor committed the actions underlying the disciplinary report and would have been dismissed regardless whether he had complained about Soucy's smoking.

Taylor was transferred from Cheshire Correctional Institution to MacDougall-Walker Correctional Institution in February 2006, approximately one month after he was cleared of the disciplinary charge. The Director of Offender Classification and Population Management is responsible for all inmate transfers. Department of Correction Administrative Directive 9.1, Section 4, www.ct.gov/doc/LIB/doc/PDF/AD/ad0901.pdf (last visited May 12, 2008). Taylor alleges only that Soucy retaliated against him and that other defendants failed to prevent the retaliation. The Director of Offender Classification and Population Management is not a defendant in this case. Absent any evidence that Soucy had the authority to order Taylor's transfer, that claim necessarily fails.

Defendants have provided evidence that the allegedly retaliatory actions would have been taken absent Taylor's complaints that Soucy smoked in the Marker Shop. Taylor fails to meet his burden in opposition to the motion for summary judgment of demonstrating the existence of a genuine issue of material fact on the retaliation claims. Accordingly, defendants' motion for summary judgment is granted with respect to all retaliation claims.

IV. Conclusion

Defendant's motion for summary judgment [**doc. #70**] is **GRANTED**. The Clerk is

directed to enter judgment in favor of the defendant and close this case.

**SO ORDERED** this 23rd day of September 2008, at Bridgeport, Connecticut.

                                                    /s/ Stefan R. Underhill
                                                   Stefan R. Underhill
                                                   United States District Judge